IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| AMERICAN BANKERS ASSOCIATION<br>1120 Connecticut Ave NW<br>Washington, DC 20036 | ) | |
| | ) | |
| CB&T BANCSHARES, INC.<br>239 E Main St<br>Marks, MS 38646 | ) | |
| | ) | |
| CITIZENS BANK & TRUST COMPANY<br>239 E Main St<br>Marks, MS 38646 | ) | |
| | ) | |
| MBT FINANCIAL CORPORATION<br>10 Washington Street<br>Monroe, MI 48161 | ) | |
| | ) | |
| MONROE BANK & TRUST COMPANY<br>10 Washington Street<br>Monroe, MI 48161 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. _____ |
| | ) | |
| FEDERAL DEPOSIT INSURANCE<br>CORPORATION<br>550 17th St NW<br>Washington, DC 20429 | ) | |
| | ) | |
| OFFICE OF THE COMPTROLLER OF THE<br>CURRENCY<br>400 7th Street SW, Suite 3E-218<br>Washington, D.C. 20219 | ) | |
| | ) | |
| BOARD OF GOVERNORS OF THE FEDERAL<br>RESERVE SYSTEM<br>20th Street and Constitution Avenue NW<br>Washington, D.C. 20551 | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Bankers Association, Citizens Bank & Trust Company, CB&T Bancshares, Inc., MBT Financial Corporation, and Monroe Bank & Trust Company (collectively, "Plaintiffs") bring this Complaint for declaratory and injunctive, including temporary and preliminary injunctive relief, and allege as follows:

## INTRODUCTION

1.      This action challenges a narrow portion of a recently-promulgated federal regulation that will cause substantial, immediate, and irreparable harm to small community banks and the customers they serve.  Without the requested relief, hundreds of community banks across the nation will be required to recognize unexpected and, in many cases, significant earnings and capital losses on or before December 31, 2013.

2.      On December 10, 2013, five Agencies – the Board of Governors of the Federal Reserve Board ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of the Comptroller of the Currency ("OCC"), the Securities and Exchange Commission ("SEC"), and the Commodity Futures Trading Commission ("CFTC") – promulgated a 71-page Final Rule, supported by an 882-page preamble, to implement the "Volcker Rule" contained in the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, § 619, 12 U.S.C. § 1851. *See* Decl. of Christian J. Pistilli ¶¶ 2-3 (attaching a true and correct copy of the Final Rule as Exhibit A and a true and correct copy of the Preamble to the Final Rule as Exhibit B).  To the shock of community banks, the Final Rule unexpectedly requires banks to divest their holdings in a commonly held debt instrument known as a "TruPS-backed CDO" by 2015 and, under Generally Accepted Accounting Principles ("GAAP"), to take an *immediate* and *irrevocable* hit to earnings and capital as a result.

3.     On this narrow issue, the Final Rule cannot stand.  *First*, it is contrary to law, impermissibly treating a debt instrument with no participation in profits and losses as a prohibited, equity-like "ownership interest."  *Second*, its sweeping expansion of the term "ownership interest" is not a logical outgrowth of the Proposed Rule and therefore violates the notice-and-comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-596, 706.  And *third*, the Agencies' utter disregard of the great costs imposed on community banks, despite a statutory obligation to consider these costs and their avowed objective of minimizing the burden on these small institutions, was arbitrary and capricious.  *Id.*

4.     The consequences of these errors will be grave.  The Final Rule will impact over 275 banks and cause an estimated $600 million in capital to vanish overnight.  These capital losses will immediately subject small banks to increased regulatory scrutiny, increase the cost of acquiring funds, and adversely affect the banks' ability to make loans and to provide other services to members of their communities.

5.     Unless this portion of the Final Rule is suspended by the courts prior to December 31, 2013, moreover, the earnings and capital losses that these banks will experience as a result of the Final Rule will be irreparable.

## PARTIES

6.     Plaintiff American Bankers Association ("ABA") is a trade association headquartered in Washington, DC.  ABA is the leading voice of America's $14 trillion banking industry.  Most of its members are small, community banks with less than $185 million in assets.  ABA's bank members rely on ABA for advocacy, information, training, products, and services to make their banks more successful and enhance their ability to serve their customers and their communities.

7.      Plaintiff CB&T Bancshares, Inc. is a bank holding company headquartered in Marks, Mississippi.  CB&T Bancshares, Inc. is regulated by the Federal Reserve.

8.      Plaintiff Citizens Bank & Trust Company is a state-chartered community bank headquartered in Marks, Mississippi.  Citizens Bank & Trust Company's primary federal regulator is the FDIC.  Citizens Bank & Trust Company is a wholly owned subsidiary of CB&T Bancshares, Inc.

9.      Plaintiff MBT Financial Corporation is a bank holding company headquartered in Monroe, Michigan.  MBT Financial Corporation is regulated by the Federal Reserve.

10.     Plaintiff Monroe Bank & Trust Company is a state-chartered community bank located in Monroe, Michigan.  Monroe Bank & Trust Company is regulated primarily by the FDIC.  Monroe Bank & Trust Company is a wholly owned subsidiary of MBT Financial Corp.

11.     Defendant FDIC is an agency of the United States Government with offices at 550 17th St NW, Washington, DC 20429.  The Dodd-Frank Act requires the FDIC to issue regulations implementing the "Volcker Rule" through coordinating rulemaking.

12.     Defendant OCC is an agency of the United States Government with offices at 400 7th Street SW, Suite 3E-218, Washington, DC 20219.  The Dodd-Frank Act requires the OCC to issue regulations implementing the "Volcker Rule" through coordinating rulemaking.

13.     Defendant Federal Reserve is an agency of the United States Government with offices at 20th Street and Constitution Ave NW, Washington, DC 20551.  The Dodd-Frank

Act requires the Federal Reserve to issue regulations implementing the "Volcker Rule" through coordinating rulemaking.

## JURISDICTION AND VENUE

14.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-596, 706 *et seq.*.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201–2202.[1]

15.     There exists an actual and justiciable controversy between Plaintiffs and Defendants requiring resolution by this Court.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## FACTUAL AND LEGAL BACKGROUND

A.     **The Statutory and Regulatory Scheme**

17.     Congress enacted the "Volcker Rule" as part of the Dodd-Frank Act in response to the financial crisis of 2008.  The Dodd-Frank Act was intended to protect the financial system from the systemic risks presented by large, "too-big-to-fail" institutions that, Congress determined, contributed to the crisis.  Like the Dodd-Frank Act itself, the Volcker Rule was intended to prevent large financial institutions from undertaking risky investments with their own funds, exposing taxpayers to the possibility of future bailouts in the event of catastrophic losses.  *See, e.g.*, 156 Cong. Rec. S5902-01 (Sen. Dodd) ("The purpose of the Volcker rule is to

---

[1]     Under usual circumstances, a final rule promulgated by the FDIC and OCC would be reviewable in this Court.  5 U.S.C. § 703; 28 U.S.C. §§ 1331, 1361, 2201-2202.  While Plaintiffs have urged the D.C. Circuit to take jurisdiction over the FDIC and OCC in addition to the Federal Reserve, this joint rulemaking presents complicated jurisdictional issues that renders jurisdiction not free from doubt. Plaintiffs have therefore followed the D.C. Circuit's counsel and filed simultaneously in both courts.  *See Nat'l Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 272 (D.C. Cir. 2012).  In light of the emergency nature of this proceeding and the possibility that the D.C. Circuit might decline jurisdiction over some or all aspects of this case, this Court should retain jurisdiction unless and until the D.C. Circuit acts.

eliminate excessive risk taking activities by banks."); 156 Cong. Rec. S4138-01 (May 24, 2010)
(Sen. Dodd) ("We have also included the Volcker rule to help ensure that the biggest firms are as
stable as possible."); 156 Cong. Rec. S2682-02 (Apr. 27, 2010) (Sen. Merkley) ("[A] strong
Volcker Rule is one of the most important provisions to prevent "too big to fail" financial
institutions."); 156 Cong. Rec. S295-02 (Sen. Feinstein) ("The administration just proposed the
Volcker rules which I believe would succeed in ending the rampant speculation and excessive
size of 'too big to fail' institutions that led us to where we are today."); 156 Cong. Rec. H5233-
01 (June 30, 2010) (Rep. Kanjorski) ("[T]he Volcker rule will prohibit banks from engaging in
highly speculative activities that in good times produce enormous profits but in bad times can
lead to collapse.").

   18. The Volcker Rule, codified at 12 U.S.C. § 1851, contains two prohibitions
on "banking entities."  First, it restricts banking entities from engaging in "proprietary trading."
12 U.S.C. § 1851(a)(1)(A).  Second, and at issue here, it provides that banks may not "acquire or
retain any equity, partnership, or other *ownership interest*" in a "covered fund."  12 U.S.C.
§ 1851(a)(1)(B) (emphasis added).  Under the statute, the Federal Reserve, FDIC, OCC,
Securities and Exchange Commission ("SEC"), and the Commodity Futures Trading
Commission ("CFTC" and, collectively, the "Agencies") were required to issue regulations
implementing these requirements through a "coordinating rulemaking."  *Id.* § 1851(b)(2).

   19. On November 7, 2011, the Agencies issued a Notice of Proposed
Rulemaking.  *See* Prohibitions and Restrictions on Proprietary Trading and Certain Interests in,
and Relationships With, Hedge Funds and Private Equity Funds, 76 Fed. Reg. 68,846
("NPRM").  The NPRM spanned more than 500 pages and included "nearly four hundred
distinctly worded 'questions.'"  Dissenting Statement  of Commissioner Daniel M. Gallagher

Regarding Adoption of Rule Implementing the Volcker Rule ("Commissioner Gallagher

Dissent"), *available at* http://www.sec.gov/News/PublicStmt/Detail/PublicStmt/

1370540477693#.UrjeDdJDuSo.

      20.     Under the Proposed Rule, "any ownership interest in . . . a covered fund"

would be prohibited.  NPRM § _.10(a), 76 Fed. Reg. at 68,950.  The Proposed Rule defined

"ownership interest" to include any "other similar interest (including, without limitation, a share,

equity security, warrant, option, general partnership interest, limited partnership interest,

membership interest, trust certificate, or other similar instrument) in a covered fund, whether

voting or nonvoting, or any derivative of such interest." *Id.* § _.10(b)(3)(i), 76 Fed. Reg. at

68,950.  The Agencies explained that this definition "focuses on the attributes of the interest and

whether it provides a banking entity with economic exposure to the profits and losses of the

covered fund." *Id.* at 68,897.  They continued that if a "debt security" that exhibits

"*substantially* the *same characteristics* as an equity or other ownership interest (e.g., provides the

holder with voting rights, the right or ability to share in the covered fund's profits or losses, or

the ability, directly or pursuant to a contract or synthetic interest, to earn a return based on the

performance of the fund's underlying holdings or investments)," it "*could*" be considered an

"other similar instrument." *Id.* (emphasis added).

      21.     During the notice and comment period, the Agencies received more than

18,000 comments.  *See* Final Rule at 4.  Notably, commenters did not focus on the possibility

that debt instruments such as TruPS-backed CDOs might be considered "ownership interests"

because they are not generally understood to be equity interests or substantially similar to equity

interests.

22.     The Agencies issued their Final Rule on December 10, 2013.  Numerous

parties took issue with the chaotic interagency process that led to the adoption of the Final Rule.

SEC Commissioner Daniel Gallagher protested that the SEC was given "less than a week to

review the nearly one thousand pages of the adopting rule" and was "under intense pressure to

meet an utterly artificial, wholly political end-of-year deadline."  Commissioner Gallagher

Dissent.  Commissioner Scott O'Malia of the CFTC noted that "[t]he first opportunity each

Commissioner had to review a partial draft of the nearly 1,000-page final rule came only three

weeks prior to [the agency's] vote."  Statement of Dissent by Commissioner O'Malia (Dec. 10,

2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/omaliastatement12101.

23.     In the Final Rule, the definition of "ownership interest" was unexpectedly

and dramatically expanded.  The Final Rule defined "ownership interest" to include, among

other things:

> (i) Ownership interest means any equity, partnership, or other
> similar interest. An "other similar interest" means an interest that:
>
> (A) Has the right to participate in the selection or removal of a
> general partner, managing member, member of the board of
> directors or trustees, investment manager, investment adviser,
> or commodity trading advisor of the covered fund (excluding
> the rights of a creditor to exercise remedies upon the
> occurrence of an event of default or an acceleration event);
>
> (B) Has the right under the terms of the interest to receive a
> share of the income, gains or profits of the covered fund;
>
> (C) Has the right to receive the underlying assets of the
> covered fund after all other interests have been redeemed
> and/or paid in full (excluding the rights of a creditor to exercise
> remedies upon the occurrence of an event of default or an
> acceleration event);
>
> (D) Has the right to receive all or a portion of excess spread
> (the positive difference, if any, between the aggregate interest
> payments received from the underlying assets of the covered

fund and the aggregate interest paid to the holders of other outstanding interests);

(E) Provides under the terms of the interest that the amounts payable by the covered fund with respect to the interest could be reduced based on losses arising from the underlying assets of the covered fund, such as allocation of losses, write-downs or charge-offs of the outstanding principal balance, or reductions in the amount of interest due and payable on the interest;

(F) Receives income on a pass-through basis from the covered fund, or has a rate of return that is determined by reference to the performance of the underlying assets of the covered fund; *or*

(G) Any synthetic right to have, receive, or be allocated any of the rights in paragraphs (d)(6)(i)(A) through (d)(6)(i)(F) of this section.

Final Rule § _.10(d)(6)(i), at 32.

24.     Thus, the Final Rule enumerates a list of seven features connected by the disjunctive "or," rendering each one independently sufficient to trigger treatment as a prohibited "ownership interest."

### B.     The Final Rule Is Met With Widespread Criticism

25.     On December 17, 2013, ABA joined other members of the banking industry and Congressional leaders in writing to the Federal Reserve, the FDIC, and the OCC regarding the Final Rule's treatment of bank investments in TruPS-backed CDOs.  ABA reported to these regulators that a variety of community and midsize banks had expressed concern that they would suffer significant and unexpected hits to their earnings and their capital as a result of the Final Rule.

26.     The Final Rule has also come under significant criticism from bipartisan members of both houses of Congress.  For example, on December 18, Sens. Mark Kirk (R-Ill.), Joe Manchin (D-W.Va.), and Roger Wicker (R-Miss.) called the application of the Final Rule to

community bank TruPS "misguided," and warned federal regulators that "the impacts could be devastating to shareholders and the capital of a large number of community banks across the country."

27.     That same day, a bipartisan group of Mississippi lawmakers – Sens. Thad Cochran (R-Miss.) and Roger Wicker (R-Miss.) and Reps. Bennie Thompson (D-Miss.), Gregg Harper (R-Miss.), Alan Nunnelee (R-Miss.), and Steven Palazoo (R-Miss.) – urged regulators to "consider measures to protect community banks that already hold TRUPS" in light of the imminent losses those banks faced as a result of the Final Rule.

28.     Other members of Congress echoed these concerns.  For example, Sen. Mike Crapo observed that the Final Rule would cost community banks "an estimated cost of hundreds of millions of dollars," and he urged regulators to "issue prompted appropriate guidance to assist these firms in complying with the [Final Rule] without having to divest these holdings at an exorbitant loss or having to spend millions of dollars to be in compliance."

29.     Likewise, Reps. Jeb Hensarling (the House Financial Services Committee Chairman) and Shelly Capito (the Financial Institutions Subcommittee Chairman) warned regulators that the "unintended consequences" of the Final Rule would trigger an "immediate write-down of these assets [that] could needlessly harm the capital positions and earnings of the financial institutions holding the assets."  And Rep. Robert Hurt told regulators that the Final Rule "will have a significant detrimental impact on hundreds of community banks across the country," and he urged regulators to "take immediate steps to provide a remedy for community banks that are facing this consequence."

30.     On December 19, 2013, the Federal Reserve, the FDIC, and the OCC issued an "FAQ" document.  This document, however, failed entirely to alleviate the imminent

capital losses that community banks across the country are now facing as a result of the Final Rule.

### C.   TruPS-backed CDOs

31.   The Final Rule's expanded definition of "ownership interest" now covers a type of debt instrument known as collateralized debt obligations backed by trust-preferred securities, which are commonly called "TruPS-backed CDOs."

32.   A trust-preferred security is created when a bank issues debt to a trust created by that bank, and then sells its right to receive interest and principal payments on that debt to third-party investors.  A TruPS-backed CDO is created when a financial firm purchases multiple trust-preferred securities, packages those securities into a single security, and sells new debt interests in that single security to investors.

33.   The fair market value of a TruPS-backed CDO fluctuates based on several factors, including the reliability of the income stream from the TruPS-backed CDO.  The income stream from a TruPS-backed CDO depends on the ability of the originating banks to make promised payments on a timely basis to the TruPS-backed CDO.  As it becomes less likely that an originating bank will be able to make payments to the TruPS-backed CDO, or as payments are in arrears, the fair market value of the TruPS-backed CDO falls.

34.   However, unlike an equity interest, banks did not acquire TruPS-backed CDOs hoping to profit from fluctuations in market value.  Rather, banks purchased TruPS-backed CDOs because they expected to receive a fixed income stream, akin to that generated by any other debt instrument, over the life of the instrument.

35.   In general, banks purchased TruPS-backed CDOs with the intention of holding them on a long-term basis.  A bank that holds a TruPS-backed CDO to maturity can ignore short term fluctuations in the market value because they will receive the full value of the

TruPS-backed CDOs income stream.  TruPS-backed CDOs are considered debt securities because they generate fixed returns based on the payment requirements of the underlying fixed-income trust-preferred securities, a fundamental characteristic of a fixed-income investment.

36.     Many community banks purchased TruPS-backed CDOs because of their favorable tax, accounting, and regulatory treatment.  As part of the Dodd-Frank Act, banks were prohibited from issuing new TruPS for capital purposes.  However, nothing in the Dodd-Frank Act prohibited community banks from continuing to own TruPS-backed CDOs or purchasing such investments from other banks.  Accordingly, all of the TruPS-backed CDOs held by banks were issued before the enactment of the Dodd-Frank Act.

37.     As a result of the financial crisis of 2008 – when many banks that originally issued trust-preferred securities suspended payments to the related TruPS-backed CDOs – current fair market value of a typical TruPS-backed CDO held by a community bank declined and today is worth less than its amortized cost.  However, as the economy has strengthened, these market values, while still depressed, have in recent months improved, and many community banks report that they expect the income stream from a TruPS-backed CDO to increase and the fair market value of a TruPS-backed CDO to recover over time.

38.     As a result, many community banks reasonably expect their investment in TruPS-backed CDOs to provide improving returns if they are able to hold the debt security on a long-term basis, as they originally planned in making their investment.

**D.     The Treatment Of TruPS-backed CDOs Under GAAP**

39.     The Financial Accounting Standards Board ("FASB") promulgates detailed accounting standards that govern banks' accounting practices in the United States. FASB accounting standards are viewed as authoritative by both the SEC and the American Institute of Certified Public Accountants.

40.     Under FASB Accounting Standards Codification Topic No. 320-10-35, when the fair value of a debt security falls below the amortized cost of the security, a bank must determine whether the impairment of the asset is "other than temporary."  Generally speaking, an "other than temporary impairment" occurs when either (i) the bank intends to sell the security, or (ii) it is unlikely that the bank will be able to hold the security until it recovers the entire amortized cost basis of the security. *See* FASB Accounting Standards Codification Topic No. 320-10-35-33A, -33B, -33C, -33D, and -33E.

41.     Under the Topic 320-10-35-34A, banks are required to record a loss recognized to earnings resulting from an "other than temporary impairment" only under specified circumstances.  If a bank does not intend to sell the security and the bank concludes that the bank more likely than not is able to hold the security until recovery, then the difference in the amortized cost of the security and its fair value must be separated into two categories: (1) the amount of the loss attributable to any credit loss, and (2) the amount of the loss attributable to all other factors.  General market fluctuations are one of the factors normally included within "all other factors."  *See* FASB Accounting Standards Codification Topic No. 320-10-35-34C.  Under these circumstances, only the amount of the loss attributable to any credit loss is recognized in earnings.  *See* FASB Accounting Standards Codification Topic No. 320-10-35-34D.

42.     If, on the other hand, a bank intends to sell the security or concludes that the security more likely than not must be sold before recovery, the bank must record an immediate loss to earnings measured by the full difference between the fair value of the debt security and the amortized cost of that instrument.  *See* FASB Accounting Standards Codification Topic No. 320-10-35-34B.

43.     Accordingly, under GAAP, banks do not record as losses through earnings the decline in the fair market value of their TruPS-backed CDO holdings that they intend to retain to maturity if those losses do not represent expected credit losses.

**E.     Tier 1 Capital**

44.     A bank's Tier 1 capital level is the amount of core equity capital in a bank. As explained below, the ratio of a bank's Tier 1 capital to its risk-weighted assets (often called a "Tier 1 capital ratio") is a principal measure that banks and bank regulators use to determine the financial well-being of a bank. Under regulatory capital statutes, a bank's "Tier 1 capital" is only impacted if a loss is required to be recognized in its earnings.

45.     Under recently adopted Basel III capital standards – a global, voluntary regulatory standards used to assess the adequacy of a bank's capital and market liquidity risk – a bank's Tier 1 capital ratio has gained increased importance.  The amount of Tier 1 capital a bank holds governs the amount of loans it can make and other services that it can provide to its customers.  The level of a bank's Tier 1 capital also affects the bank's funding costs, as banks with lower capital levels must bear significantly increased funding costs, including higher borrowing rates in the interbank and capital markets.  It can also affect premiums that the bank pays to the FDIC under the FDIC's risk-based premium schedule.  In addition, if a bank's Tier 1 capital ratio falls too low, the bank will be subject to increased regulatory scrutiny and oversight, including regulatory limitations on its activities.  In extreme cases, a bank may be placed into receivership by the Federal Deposit Insurance Corporation as a result of a decrease in its Tier 1 capital to dangerously low levels.

**F.     The Immediate Impact Of The Final Rule On Banks' Capital And Earnings Under GAAP**

46.     By requiring that banks sell any interest they have in TruPS-backed CDOs by 2015, the Final Rule will cause an immediate and irrevocable impairment to community banks' earnings and Tier 1 capital levels.

47.     As a result of the financial crisis – when many banks that originally issued trust-preferred securities suspended payments to the related TruPS-backed CDOs – current fair market value of a typical TruPS-backed CDO held by a community bank declined and today is worth less than its amortized cost.  However, as the economy has strengthened, these market values, while still depressed, have in recent months improved, and many community banks report that they expect the income stream from a TruPS-backed CDO to increase and the fair market value of a TruPS-backed CDO to recover over time.

48.     As a result, many community banks have reported that they reasonably expect the TruPS investments to provide improving returns if they are able to hold the debt security on a long-term basis as they originally planned in making their investment. Accordingly, under GAAP, banks do not record as losses through earnings the decline in the fair market value of their TruPS-backed CDO holdings that they intend to retain to maturity if those losses do not represent expected credit losses.

49.     The Final Rule unexpectedly changes this treatment for TruPS CDOs. Because the Final Rule requires community banks to sell any interest they have in trust-preferred securities by July 2015, under GAAP, banks will be required, on their next reporting date, to recognize into earnings the full difference between the fair value and the amortized cost of the TruPS.

## NEED FOR IMMEDIATE JUDICIAL RELIEF

**G.     Community Banks Will Suffer Irreparable Harm Absent Immediate Court Intervention.**

50.     The Final Rule will have a significant, irreversible financial impact on small community banks as early as December 31, 2013.  By requiring banks to sell TruPS-backed CDOs by July 2015, the Final Rule – in conjunction with applicable accounting rules – effectively requires that banks to recognize significant and unexpected losses on these investments at the end of their fiscal year – *i.e.*, on December 31, 2013 in many cases.

51.     ABA has acquired data from regulatory sources as well as from member banks that enable it to assess the impact of the Final Rule on its members.  ABA estimates that the Final Rule affects at least 275 banks, which collectively hold $3.5 billion in TruPS-backed CDOs.  Based on the fair market value of these debt instruments as of September 31, 2013, the Final Rule would cause these banks to lose approximately $600 million by December 31, 2013.  Overall, this cost amounts to about 2.6 percent of the affected institutions' Tier 1 capital.

52.     Unless it is suspended before December 31, 2013, the Final Rule would have an especially devastating impact on smaller banks – *i.e.*, those with less than $500 million in assets.  ABA estimates that the Final Rule will impact 110 banks with less than $500 million in assets. These banks collectively hold $210 million in TruPS-backed CDOs, and they would suffer a loss of $78.6 million if they were to write these loans down to their fair market value as of September 31, 2013.  Overall, this cost amounts to about 4.2 percent of these small banks' Tier 1 capital.

53.     Based on ABA's analysis, 37 banks would suffer losses so great that – as a result of the Final Rule – more than an entire year of earnings would be wiped out instantly.  In some cases, these losses would be so large they are greater than five times (year-to-date) earnings.

54.     These substantial losses will have a number of serious and irreparable adverse consequences.  First, the announcement that a bank's earnings and capital levels have fallen would likely seriously damage the reputation of a bank in its community, with its customers, its investors, and in the markets generally.  This in turn may materially impact the bank's on-going operations in several ways.  Among other things, the bank's costs of acquiring funds to make new loans would increase, as third-party lenders and investors would charge the bank more in light of the perceived increased risk to the bank's balance sheet and the reduced ability to pay dividends and other returns on investment.  Depositors and potential depositors – especially those who have deposited or intend to deposit funds in excess of the FDIC's insurance limit – might withdraw their funds or choose not to become customers of the bank.

55.     Second, a decrease in a bank's capital levels may place a bank in a lower capital category.  A bank that falls into a lower capital category is likely to face significantly increased funding costs:  depositors may demand higher interest rates, and the FDIC will charge higher deposit insurance premiums.

56.     Third, a decrease in a bank's capital levels may affect its relationship with its regulators.  Regulators rate banks through a non-public CAMELS rating (the acronym that regulators use as to  measure a bank's Capital adequacy, Asset quality, Management, Earnings, Liquidity, and Sensitivity to risk).  A decrease in earnings as well as in capital levels would affect a bank's CAMELS rating, which in turn would result in increased regulatory oversight and supervisory restrictions on bank activities, such as limitations on payment of dividends as well as expansion of operations.

57.     These concerns are especially acute in the wake of the financial crisis of 2008.  Many small community banks remain in a weakened condition as a result of the financial

crisis and thus will find it particularly difficult to respond to the unexpected – and in many cases very significant – decreases in their capital levels as a result of the Final Rule.

58.     Finally, a bank's capital level directly impacts its ability to make loans and provide other services to members of its community.  The more capital a bank has, the greater the amount of loans and financial services it is able to provide.

59.     For example, a typical community bank with $200 million in loans and other assets would hold about $20 million in capital.  A reduction in capital of $2 million could force the bank to reduce its loans and assets by as much as $20 million.  Thus, if a bank's capital funding ratio is "right-sized," a sudden drop in the bank's level of regulatory capital will most likely require the bank to decrease its lending activity precipitously.  In some communities, this decision can have a devastating impact on small business, because the local community bank has been the available borrowing option for the business.

60.     Banks affected by the Final Rule, moreover, in the absence of emergency relief, would have no recourse to remedy these significant harms.  Under FASB accounting standards, once a bank realizes the loss in a TruPS-backed CDO's fair market value on December 31, 2013, that charge – and the corresponding impact on a bank's capital levels – is irreversible.  This is true even if the Agencies or a court later vacates the impact of the Final Rule on TruPS.  Nor could the banks obtain a monetary recovery from the Agencies for these significant reputational and financial harms, as the Defendants are government agencies entitled to sovereign immunity.

61.     The actual loss to these institutions may ultimately be even greater.  The Final Rule requires all banks (including several large banks with substantial TruPS investments) to sell their holdings in these debt instruments within 19 months.  The flood of TruPS-backed

**MATERIAL UNDER SEAL DELETED**

CDOs into the market, while dramatically reducing the number of typical investors in these instruments, will depress the market value of these investments, effectively requiring the banks to sell their TruPS-backed CDOs at fire-sale prices.  Accordingly, it is likely that banks will face additional earnings and capital losses in 2014 as the market value for these debt instruments falls.

**H.      Irreparable Harm To Plaintiffs**

62.

63.

64.

65.

66.

67.



**I.    The Balance of Hardships Favors a Temporary Restraining Order and a Preliminary Injunction.**

74.    In contrast to the significant and immediate harm that Plaintiffs and

hundreds of banks across the nation will face in the absence of emergency relief, neither the

Agencies nor anyone else would suffer any harm if Plaintiffs' relief were granted.  The Final Rule permits banks to continue to own their existing TruPS-backed CDOs until at least July 2015.  Accordingly, a temporary restraining order and preliminary injunction would preserve the status quo without impairing the regulatory objectives of the Final Rule.

      **J.**      **The Public Interest Favors a Temporary Restraining Order and a Preliminary Injunction.**

      75.      The public interest would also be served by issuing a temporary restraining order and preliminary injunction.  If hundreds of small, community banks are unexpectedly required to take significant capital losses on December 31, 2013, they likely will be forced to immediately decrease their lending activity.  This would have a devastating impact on their prospective borrowers, including on the many small businesses that rely on local community banks.

## COUNT I

### (Administrative Procedure Act - Exceeds Statutory Authority)

      76.      Paragraphs 1-75 are incorporated herein by reference.

      77.      The Dodd-Frank Act prohibits a "banking entity" from "acquir[ing] or retain[ing] any equity, partnership, or other *ownership interest* in" a covered fund.  12 U.S.C. § 1851(a)(1)(B) (emphasis added).

      78.      The Final Rule's definition of "ownership interest" cannot be squared with the plain language of the statute.   The Final Rule lists seven purported attributes of ownership, each one of which is deemed sufficient. Final Rule § _.10(d)(6)(i), at 32.  A debt interest can therefore qualify as "ownership" based solely on the holder's right to participate in the removal of managers, for example, even if the investment otherwise provides only for the payment of fixed returns and otherwise bears all of the traditional indicia of debt. *Id.* § _.10(d)(6)(i)(A).  In

other words, the Final Rule covers investments, like TruPS backed CDOs, that do not expose the holder to the type of investment risk Congress actually sought to address.

79.     The Final Rule exceeded the Agencies' statutory authority under the Dodd Frank Act and is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.

## COUNT II

### (Administrative Procedure Act - Failure to Provide Adequate Notice and Comment)

80.     Paragraphs 1-79 are incorporated herein by reference.

81.     The Agencies adopted the Final Rule without providing interested parties the "fair notice" required by the APA.

82.     The Proposed Rule's definition of "ownership interest" did not expressly include debt securities.  *See* 76 Fed. Reg. at 68,950 (proposed § __.10(b)(3)(i)).  Instead, the Proposed Rule listed equity interests, partnership interests, shares, equity securities, warrants, options, general partnership interests, membership interests, and trust certificates – *but not debt securities* – as types of "ownership interests."  *See id.*  At most, the Agencies suggested in the preamble that a debt security "*could*" fall within the rule's catch-all for "other similar instruments" if the debt security "exhibits *substantially the same characteristics* as an equity or other ownership interest."  *Id.* at 68,897 (emphases added).

83.     The Final Rule abandons the Proposed Rule's definition of "ownership interests."  *See* Final Rule at 32 (to be codified at § __.10(d)(6)(i)).  Instead, the Final Rule purports to identify numerous "features" and "characteristics" of equity interests, Final Rule at 609, 612, including the right to participate in the removal of management and the right to receive a share of the profits.  *See* Final Rule at 32 (to be codified at § __.10(d)(6)(i)).  The Final Rule, moreover, defines "ownership interest" to include "*any* interest in or security issued by a covered

fund that exhibits *any* of the[se] features or characteristics," *id.* at 609 (emphasis added). Potentially interested parties could not have expected the Agencies to expand the proposed definition so dramatically.

84.     Furthermore, community banks could not have been expected to anticipate and comment upon the Final Rule's definition of "ownership interest", because – as the Agencies acknowledge – that definition encompasses interests, like interests in TruPS backed CDOs, that would not ordinarily be considered ownership or equity interests.  Indeed, the absence of significant comments from community banks and their representatives regarding this issue – which is of critical importance to them – confirms that the Proposed Rule failed to provide adequate notice.

85.     The Final Rule violated the notice-and-comment requirements of the APA and is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.

## COUNT III

### (Administrative Procedure Act - Arbitrary and Capricious Action)

86.     Paragraphs 1-85 are incorporated herein by reference.

87.     Although the Agencies set out to craft a rule that would have minimal burdens on community banks, the Final Rule's application to TruPS-backed CDOs will have precisely the opposite effect.  An agency decision that ignores substantial economic costs and achieves the opposite of its intended result is not reasoned and thus arbitrary and capricious.

88.     The Agencies are required by law to consider whether the rules they propose will have a significant economic impact on a substantial number of "community banks." 5 U.S.C. §§ 603-604.  For these purposes, a "community bank" is defined as a bank with $500 million or less in assets.  5 U.S.C. § 601(3); 13 C.F.R. § 121.201.

89.     To satisfy this requirement, the Agencies repeatedly assured community banks that the Final Rule would not materially affect their operations.  *See* 76 Fed. Reg. at 68,939 ("The proposed rule would not appear to have a significant economic impact" on community banks); Final Rule, Preamble at 881 (certifying that the Final Rule "will not have a significant economic impact on a substantial number of small banking entities").

90.     Despite these assurances, the Final Rule's last-minute expansion of the term "ownership interest" to sweep in TruPS-backed CDOs will have an unexpected, significant, immediate and irreversible impact on hundreds of community banks and the customers they serve.

91.     Contrary to the Agencies' assertions, the Final Rule will impact at least 110 banks with less than $500 million in assets. These banks collectively hold $210 million in TruPS-backed CDOs, and they would suffer a loss of $78.6 million if they were to write these loans down to their fair market value as of September 31, 2013.  Overall, this cost amounts to about 4.2 percent of these small banks' Tier 1 capital.

92.     The Agencies acted arbitrarily and capriciously by failing to account for the devastating economic impact of the Final Rule on small, community banks, despite their own commitment to minimizing the burden on these entities.  The Final Rule is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.

### **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that the Court issue judgment in its favor and against Defendants and award the following relief:

a.   A temporary restraining order and preliminary injunction voiding the Final Rule's definition of the term "other similar interest";

b.   Vacatur of the Final Rule's definition of the term "other similar interest" and

remand to the Agencies for (i) further notice and comment, and (ii) rulemaking consistent with

the statute; and

c.   An award of such other and further relief as the Court may deem just and

proper.

Respectfully submitted,

Anthony Herman (D.C. Bar No. 424643)
Christian J. Pistilli (D.C. Bar No. 496157)
Henry Liu (D.C. Bar No. 986296)
Andrew Soukup (D.C. Bar No. 995101)
David M. Zionts (D.C. Bar No. 995170)
Matthew J. Berns (D.C. Bar No. 998094)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, DC 20004-2401
(202) 662-6000 (Telephone)
(202) 662-6291 (Fax)

*Attorneys for Plaintiffs*

December 24, 2013